UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES BRIDGEWATER,

                  Plaintiff,                             Case Number 16-10782
                                                    Honorable David M. Lawson

v.

MICHIGAN GAMING CONTROL BOARD
and RICHARD S. KALM,

                  Defendants.
_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND RESCHEDULING FINAL PRETRIAL CONFERENCE

Plaintiff James Bridgewater, employed as a gaming engineering specialist by the Michigan Gaming Control Board (MGCB), suffers from a dermatological disease that causes severe disruption of his sleep. At one time, the MGCB authorized Bridgewater to work a flexible schedule, which allowed him to make up time he missed by working later in the work day and on weekends, and writing reports at home. Early in 2015, the MGCB terminated that arrangement, and refused to accommodate Bridgewater's request to return to it. Instead, the MGCB told Bridgewater to use leave time and submit requests under the Family and Medical Leave Act (FMLA) to address his work absences. Bridgewater filed a complaint with the Equal Employment Opportunity Commission (EEOC) that the MGCB's refusal to accommodate violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act. After that filing, says Bridgewater, the MGCB retaliated against him. Bridgewater's amended complaint in this Court under those same federal statutes has been challenged by the MGCB and codefendant Richard S. Kalm in their motion for summary judgment on three grounds: sovereign immunity; the accommodation request was

unreasonable and insufficiently documented; and there is no evidence that Bridgewater's EEOC filing caused any acts of retaliation. Finding no merit in the defendants' arguments, the Court will deny the motion for summary judgment.

## I.

### A. The Plaintiff and His Job

Bridgewater suffers from dermatitis, contact dermatitis, and eczema. Those conditions cause him "severe disruption" to his sleep and "pain and discomfort throughout the day." His doctor has prescribed dozens of oral and topical medications. Nonetheless, the condition periodically and unpredictably flares up, causing unforeseeable disruptions to his sleep schedule.

The MGCB hired Bridgewater in October 2001. Despite his condition, and throughout his time working with the MGCB, Bridgewater received satisfactory-or-better performance appraisals, including when he was allowed to work according to a flexible schedule that his supervisor had approved to accommodate the periodic disruption of his sleep schedule.

According to the MGCB, a gaming engineering specialist "serves as the statewide staff specialist regarding the evaluation of gaming-specific technology and its ramifications on and compliance with existing laws, regulations, controls, and technical standards." The job requires work in the office and on site at casinos. The specific tasks include (1) conducting risk assessments and developing test tools, technical standards, and internal controls, and monitoring the use of the same in the field; (2) reviewing, analyzing, and testing networked accounting and monitoring systems for auditability, verifiability, reliability, accuracy, interoperability, and compliance with MGCB rules; (3) reviewing engineering analyses prepared by outside engineers and examining new gaming technology to determine that it complies with applicable regulations; (4) reviewing and

analyzing new game technologies from an engineering perspective for auditability, financial accountability, and compliance with MGCB rules; (5) evaluating all "internal control amendments as assigned by the Deputy Director of Horse Racing," and conducting risk analyses of the proposed amendments; and (6) reviewing test plans, procedures, and equipment, developing new ones, and testing them, and identifying "high priority laboratory initiatives." Among those enumerated tasks, the description states that numbers (2), (4), and (5) are to be performed "as a team member [working] with the auditing specialist." The description indicates that the gaming engineering specialist's "[s]upervisor provides general guidance on how to conduct work assignments, programs, priorities, and agency policies." Finally, the description notes that the "[e]ngineer will be exposed to gaming environments; this usually involves bending, standing, loud noises, cigarette smoke and unusual working hours."

Bridgewater asserts — and the defendants apparently do not dispute — that most of his daily duties involve working in the MGCB lab and in secured rooms located at various casinos around the state, where he tests gaming devices and reports the results of his work. Bridgewater asserts that the MGCB lab and all of the on-site labs are secured by key-card readers that allow him to enter and leave at all hours, and access to casino facilities is available 24 hours a day, seven days a week, because the casinos themselves are always open, due to the nature of their business. He also asserts that he is not required to interact with casino staff, because machines to be tested are delivered to the secured facilities at various times, where they are then available until he has concluded his testing. He also contends that he and the other gaming control engineers in his department work independently of each other and do not need to coordinate their work.

## B. MGCB's Work Schedule Options

The MGCB has several work schedule options available to its employees. The "compressed work schedule" consists either of (1) four 10-hour days per week; (2) four 9-hour work days and one 8-hour work day in one week, and four 9-hour work days in the other week of each pay period; or (3) four 9-hour work days with one 4-hour work day each week. The "modified work schedule" allows employees "to start and end their work day different from the core business hours," at any time between 6:30 a.m. and 6:00 p.m. However, employees working a "modified work schedule" must "maintain a consistent eight (8) hour schedule each day." Under any of those options, the employee's schedule is required to consist of work days from Monday through Friday each week.

Until sometime in early 2015, Bridgewater's supervisor allowed him to work a flexible schedule that permitted him to make up missed hours by working later during the day or on the weekend, and, when he had work that could be performed at home, such as writing reports, to work from home rather than in his office or lab at work, whenever he missed work hours due to his condition. On February 2, 2015, after he was informed that his "flexible" schedule no longer was allowed, Bridgewater submitted a request for an "alternative work schedule" of four 9-hour days and one 4-hour day each week, Monday through Friday. That request was approved.

## C. Accommodation Request

On March 2, 2015, Bridgewater submitted a "Disability Accommodation Request and Medical Statement" in which he asked to be allowed to return to working under the "flexible work schedule" that his supervisor previously had approved. The request stated the name of Bridgewater's doctor, and it included answers on a section of the form designated for completion by his doctor, which indicated that Bridgewater had a "physical" disability that caused "severe

disruption" of his sleep and "pain and discomfort throughout the day." On March 10, 2015, MGCB Human Resources Director Donna Wilson, responding to Bridgewater's request, indicated that "additional clarification is needed." Wilson asked Bridgewater to identify for her (1) the medical condition that caused his sleep disorder; (2) the life limitations that the condition caused; (3) how the alternative work schedules allowed by the MGCB policy did not accommodate the medical condition; and (4) "what specific flexible schedule would accommodate the medical condition." Bridgewater responded that same day by email, stating that he wanted a "flexible eighty hour [per] pay period (work schedule adjusted with each pay period)" or "the ability to work in a flexible location, such as home," and that none of the options for alternative fixed schedules that the policy allowed would accommodate this request. Bridgewater stated that his "doctor has already identified the life limitation as sleep," and that the "issue [is] that as my sleep is disrupted that makes it unlikely that I can maintain a predefined schedule, alternate or otherwise." In a second email Bridgewater attached a copy of an online "Health Summary" from his doctor, which identified his medical conditions as "dermatitis," and "contact dermatitis and other eczema," and listed the medications that he had been prescribed for those conditions.

On March 13, 2015, Wilson sent Bridgewater an email stating that it was not "mutually beneficial to the agency or operationally efficient to allow undefined work schedules for employees." On March 19, 2015, Bridgewater met with Wilson to discuss his request, but Wilson refused to discuss a flexible schedule as an accommodation; she instead insisted that Bridgewater must "go to [his] doctor for a medical opinion on why the [MGCB's] alternative work schedule policy does not accommodate [his] disability."

On March 30, 2015, Wilson formally denied the accommodation request. She recharacterized Bridgewater's request as wanting "to adjust your schedule on any day you are unable to work due to your medical condition." The response form referred to the March 19 meeting in which Willson wrote that Bridgewater had told her that "circling back to [his] physician was unnecessary to provide clarification to the questions previously asked." But it also stated Wilson's understanding that the "sleep disruption is due to a dermatology (dermatitis) condition," and it acknowledged that Bridgewater had "provided . . . copies of the Health Summary [showing] the prescriptions [he was] taking." Wilson further stated that the "MGCB does allow alternative work schedules." But she concluded that if one of those options would not suffice, Bridgewater would be left with (1) using available leave credits when he was unable to work his pre-approved work schedule; or (2) requesting an intermittent FMLA leave.

Bridgewater asserts that after the denial was issued he was forced on many occasions to deplete his accumulated leave. On days when he arrived late to work, he worked extra hours after his scheduled shift ended to get his work done, but the defendants refused to pay him for those hours worked outside of his fixed schedule, even though he had taken leave hours to cover the time that he missed earlier in the day.

### D.  EEOC Charge

On April 1, 2015, Bridgewater filed a charge of disability discrimination with the EEOC, in which he stated that his reasonable request for the accommodation of a flexible work schedule was denied unlawfully. Shortly after David Hicks became Bridgewater's new manager in August 2015, Bridgewater informed Hicks that he had filed the EEOC charge. Bridgewater testified that, soon after that notification — three weeks to be exact — he suffered retaliation by the defendants when

he was: (1) subjected to an unwarranted investigation by the criminal investigations unit of the MGCB; (2) taken off of a project team and moved to another work location; (3) given an increased workload, shortened deadlines, and told to perform work without all of the information needed to complete it; (4) required to provide excessive detail to account for his hours worked and work completed that other employees in the same position were not required to provide; and (5) told that his job would be outsourced. Bridgewater also testified that, before he filed his EEOC charge, there was an initiative in the MGCB to "evaluate" the lab that he worked in and determine "what kinds of services [the lab] can provide," but that "the tone definitely changed on that after I filed my EEOC complaint," and that then the focus of the "evaluation" shifted to "let's just assume that we're going to outsource you, tell us what you would do for us."

The defendants submitted investigation reports showing that the investigation in question was prompted by time records indicating that Bridgewater worked three hours one Sunday, which was outside of the days and hours that employees are allowed to work under MGCB policy, and outside of the scheduled hours of Bridgewater's approved "alternative work schedule." The investigation, which appears to have spanned from August 2015 through January 2016, ultimately concluded that Bridgewater had not engaged in any "misconduct," because his supervisor had approved the weekend work hours. The defendants' HR Director attested that "Bridgewater's supervisor (Chris Adams) . . . had not followed MGCB procedure in approving the [weekend work] request," but that, "[b]ecause Mr. Bridgewater had received permission (albeit improperly) from his supervisor, [he] was not disciplined."

### E.  The Present Lawsuit

The plaintiff filed his original complaint in this Court on March 4, 2016 naming the Michigan Gaming Control Board and five state officials as defendants.  After several iterations of amended pleadings, the parties agreed to resolve a motion to dismiss and a motion for leave further to amend the complaint by a stipulated dismissal of all claims except (1) the ADA discrimination (reasonable accommodation) and retaliation claims in Count I of the second amended complaint against defendant Richard S. Kalm in his official capacity (seeking prospective injunctive relief only), and (2) the congruent discrimination and retaliation claims in Count II under the Rehabilitation Act, against defendant Michigan Gaming Control Board.  After discovery concluded, the defendants filed their motion for summary judgment.  The Court heard oral argument on the motion on August 3, 2017.

### II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

## A. Eleventh Amendment Immunity

Defendant MGCB argues that it is entitled to governmental immunity under the Eleventh Amendment on the plaintiff's claim under the Rehabilitation Act, which is the only claim remaining against it. The Rehabilitation Act broadly prohibits discrimination against any disabled person by state and local entities "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The MGCB relies on the state enabling and funding legislation, Michigan Compiled Laws §§ 432.204 and 432.204b(1), which initially appropriated $5 million from the state treasury for operations, and required the three major casinos to reimburse the treasury in full for that amount. The MGCB reasons, therefore, that no federal funds are used in the operation of its casino gaming program, which is the program that employs Bridgewater. However, the MGCB reads the "program or activity" language in the Rehabilitation Act too narrowly.

It is true that "'[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.'" *Babcock v. Michigan*, 812 F.3d 531, 533-34 (6th Cir. 2016) (quoting *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)). But a state "may choose to waive its immunity in federal court at its pleasure." *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (citing *Clark v. Barnard*, 108 U.S. 436, 447-448 (1883)). "States that receive federal funds waive their sovereign immunity defense to claims brought against them under the Rehabilitation Act." *Gean v. Hattaway*, 330 F.3d 758, 775 (6th Cir. 2003) (citing 42 U.S.C. § 2000d-7).

Congress has stated that "the term 'program or activity' means all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b).

Following the lead of the Supreme Court, *see Grove City College v. Bell*, 465 U.S. 555 (1984), some appellate courts have construed that phrase narrowly, holding that it "'only cover[ed] all the activities of the department or the agency receiving federal funds.'" *Arbogast v. Kansas, Dep't of Labor*, 789 F.3d 1174, 1184 (10th Cir. 2015) (quoting *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002)). Under that view, when determining "whether a particular subunit of state government is an independent department under the Rehabilitation Act," courts would consider "the state's characterization of the subunit under state law," together with "the degree of financial and administrative independence of the subunit." *Ibid.* (citing *Sharer v. Oregon*, 581 F.3d 1176, 1178, 1180 (9th Cir. 2009); *Haybarger v. Lawrence County Adult Probation & Parole*, 551 F.3d 193, 201, 202 (3d Cir. 2008)).

However, Congress expanded the reach of that phrase when it passed the Civil Rights Restoration Act of 1987. That legislation amended the Rehabilitation Act, 29 U.S.C. § 794(b), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1687), and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d-4a), to include the definition of the phrase "program or activity" noted above. *See* 29 U.S.C.A. § 794(b)(1)(A). The amendments' legislative history explained that the definitions of "program or activity" and "program" "make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." S. Rep. No. 64, 100th Cong., 2d Sess. 4.

Considering the amendments in a Title IX case, the Sixth Circuit has stated that "Congress has made clear its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs." *Horner v. Kentucky High Sch. Athletic Association*, 43 F.3d 265, 271-72 (6th Cir. 1994). The court reasoned in that case, in which Kentucky's High

School Athletic Association attempted to distance itself from federal equal opportunity legislation by contending that it did not receive federal funds, that "it appears that Kentucky's school system receives substantial federal financial assistance. The Board runs the schools, and the KHSAA, apparently funded in part through dues paid by the state's public schools, performs the Board's statutory functions with respect to interscholastic athletics. On these facts, both defendants would be subject to Title IX." *Ibid.* By that same reasoning, a judge of this Court rejected the "program specific" reasoning advanced by the defendant in a case brought under Title VI of the Civil Rights Act, holding that because the Michigan Department of Treasury receives federal funds, "[t]herefore, 'all of the operations' of these departments are a 'program or activity' for purposes of Title VI, . . . which are an operation of the Department of Treasury." *White v. Engler*, 188 F. Supp. 2d 730, 747 (E.D. Mich. 2001).

Bridgewater's Rehabilitation Act claim is not barred by the Eleventh Amendment, because the State has waived its sovereign immunity for claims under that Act where it is undisputed that the Michigan Department of Treasury — which the MGCB operates within — accepts significant federal funds. It is well accepted that a state "may choose to waive its immunity in federal court at its pleasure," *Sossamon*, 563 U.S. at 284, and "[s]tates that receive federal funds waive their sovereign immunity defense to claims brought against them under the Rehabilitation Act," *Gean*, 330 F.3d at 775.

The defendants contend that the MGCB is an "independent entity" under state law that itself receives no federal funding, and that the State therefore did not waive its immunity as to claims implicating the MGCB. Robert Simon, the MGCB's Deputy Director attested:

> The MGCB operates independently of the Department of Treasury and MGCB has its own budget. The Department of Treasury has no oversight of MGCB's budget.

MGCB's budget is funded entirely by the entities it licenses and regulates. MGCB does not receive any federal or general funds.

Def.'s Mot. for Summ. J., Ex. 2, Affidavit of Robert Simon ¶ 3 (Pg ID 323).

However, looking to the characterization of the agency under state law, the enabling statute establishing the MGCB explicitly states that it "is created within the department of treasury." Mich Comp. Laws § 432.204(1). Moreover, Michigan's Executive Organization Act of 1965 reposes all executive functions within one of twenty enumerated "principal departments," one of which is the Department of Treasury. Mich. Comp. Laws § 16.104. The Department of Treasury is named among those enumerated principal departments; the Michigan Gaming Control Board is not. The defendants have not pointed to any statutory or other authority in state law to suggest what other principal department the MGCB could belong to, if not the Department of Treasury.

The defendants correctly point out that "[g]enerally, courts considering the scope of a state entity's waiver under the Rehabilitation Act acknowledge that the definition of 'program or activity' was 'not intended to sweep in the whole state or local government' whenever one subdivision discriminates." *Arbogast*, 789 F.3d at 1184 (quoting *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991)). However, "[w]hen courts consider whether a particular subunit of state government is an independent department under the Rehabilitation Act, they look to the state's *characterization of the subunit under state law*." *Ibid.* (emphasis added). In this case, nothing in the enabling statute suggests that the MGCB is anything other than an organ of the Department of Treasury. Contrary to the defendants' naked claim that the department "operates independently," the pertinent statutory passages do not use the term "independent" or any variation of it when describing the Board's situs and composition, and the defendants have not cited any provision of Michigan law purporting to isolate the board or render it "independent" of its parent agency. *See*

Mich. Comp. Laws § 432.204. Moreover, in other provisions, the enabling act expressly contemplates that the administration of gaming regulation in the State will be handled cooperatively by MGCB and the Department of Treasury, where the act also creates a "gaming fund" as a repository of casino-related taxes to be collected and disbursed by the Treasury. *See* Mich. Comp. Laws § 432.212(2); Mich. Comp. Laws § 432.212(13)-(14) ("The taxes imposed under this section and any tax imposed under section 13(2) *shall be administered by the department of treasury* in accordance with 1941 PA 122, MCL 205.1 to 205.31, and this act," but "[f]unds from this act shall not be used to supplant existing state appropriations or local expenditures."). Although those provisions are not dispositive of the status of the MGCB, they certainly do not aid the defendants' position.

The defendants insist that the MGCB should be treated separately because it is separately funded and Treasury has no control over its budget. But separate funding alone is not enough to qualify an agency for partitioned treatment under the Rehabilitation Act, where it is otherwise regarded as integral to a larger department under state law. The Tenth Circuit considered remarkably similar facts in *Arbogast v. Kansas Department of Labor* and held that the "Workers Compensation Division" of the Kansas Department of Labor, which itself did not receive federal funds, did not qualify for separate treatment under the Rehabilitation Act, when the Unemployment Insurance Division did receive federal funds. The court noted that "a division that accepts no federal funds can nonetheless fall within the scope of an Eleventh Amendment waiver so long as that division is part of the same department under state law." The court held that because under state law the department of labor "actively administers both the Unemployment Insurance Division and the Workers Compensation Division . . . the Workers Compensation Division's separate funding does

-13-

not make it so independent of the Department of Labor that it should be considered its own program or activity under the Rehabilitation Act." *Arbogast*, 789 F.3d at 1184-86.

In this case, there are fewer explicit statutory ties than the panel observed in *Arbogast*. However, the absence of any statutory indicators of independence weighs heavily in favor of accepting the statute at face value, which plainly declared that the MGCB was "created *within the department of treasury*," and it therefore is a part of that entity.

The MGCB has waived its Eleventh Amendment immunity for Bridgewater's Rehabilitation Act claim.

### B. Disability Discrimination Claim

Both defendants contend that the reasonable accommodation claims must be dismissed because Bridgewater cannot establish that he provided sufficient information for the defendants to identify and evaluate his request for an accommodation, since he refused to disclose the name of his medical condition or to explain how it limited any major life activity. They also insist that he cannot show that his requested accommodation was reasonable, because allowing the open-ended, flexible schedule that Bridgewater requested would cast an "undue hardship" on the agency where (1) allowing the plaintiff to work "alone in the gaming laboratory's isolated location posed a real safety and security concern," and (2) "the nature of his position required that he work with his supervisors and co-workers on a regular basis."

Those arguments address the plaintiff's claims under both the ADA and the Rehabilitation Act. "Both the ADA and [the Rehabilitation Act] prohibit retaliation against any individual because of his or her opposing practices made unlawful by the Acts or otherwise seeking to enforce rights under the Acts." *A.C. ex rel. J.C. v. Shelby County Board of Education*, 711 F.3d 687, 696-97 (6th

Cir. 2013) (citing 42 U.S.C. § 12203; 29 U.S.C. § 794(a)). Moreover, "the ADA and the Rehabilitation Act 'are quite similar in purpose and scope.'" *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004) (quoting *McPherson v. Mich. High Sch. Athletic Association, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)). Thus, the Sixth Circuit has "held that '[t]he analysis of claims under the [ADA] roughly parallels those brought under the Rehabilitation Act.'" *Ibid.* (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996)). "As a result, 'cases construing one statute are instructive in construing the other.'" *Ibid.* (quoting *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir.1997)).

"Failure to provide a reasonable accommodation to a disabled, but otherwise qualified, person in the workplace is deemed unlawful discrimination under the ADA." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (citing 42 U.S.C. § 12112(b)(5)(A); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). The elements of a disability discrimination claim for failure to accommodate have been clearly defined. First, the "plaintiff must demonstrate that . . . []he is disabled." *Ibid.* (citing *Kleiber*, 485 F.3d at 868; *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). Then, he must show that "[]he is 'otherwise qualified' for the position despite' h[is] disability, either with or without a reasonable accommodation." *Ibid.* Finally, the "employee must . . . show that he proposed an accommodation and that the desired accommodation is objectively reasonable." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008)).

As to the first element, an individual is disabled under the ADA if the individual has or is regarded as having "a physical or mental impairment that substantially limits one or more major life

activities." 42 U.S.C. § 12102(1)(A) & (C).  A major life activity includes, among other things, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).  *See Martin v. Huron Valley Ambulance, Inc.*, 226 F. Supp. 3d 871, 883 (E.D. Mich. 2016).

On the second element, "[a]n employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not."  *Williams*, 847 F.3d at 391 (citing 42 U.S.C. § 12111(8)).  "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term 'essential functions' does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).

The general rule is "that regularly attending work on-site is essential to most jobs, especially the interactive ones," and that notion "aligns with the text of the ADA," which defines "[e]ssential functions [as] those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential."  *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761-62 (6th Cir. 2015) (quoting 42 U.S.C. § 12111(8)).  "[I]n most jobs, especially those involving teamwork and a high level of interaction, the employer will require regular and predictable on-site attendance from all employees (as evidenced by its words, policies, and practices)."  *Id.* at 762.  However, "[t]he *Ford* decision leaves open the possibility that regular attendance might not be an essential function of every job, but suggests that exceptions will be relatively rare."  *Williams*, 847 F.3d at 392.

The *Ford* court looked to the factors outlined in 29 C.F.R. § 1630.2(n)(3) for guidance in analyzing regular attendance as an essential function.  That regulation states that "Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment

as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; [and] (vii) The current work experience of incumbents in similar jobs." The court concluded that all of those factors weighed in favor of finding regular attendance to be a fundamental requirement of most jobs, because "most jobs would be fundamentally altered if regular and predictable on-site attendance is removed." *Ford*, 782 F.3d at 762. The court also observed that "'[c]ommonsense notions' that physical presence at work is important to most jobs . . . also support[] this outcome." *Williams*, 847 F.3d at 392 (quoting *Ford*, 782 F.3d at 762-63). Finally, the court noted that the EEOC's informal guidance on the issue suggests that "[a]n employer may refuse a telecommuting request when, among other things, the job requires 'face-to-face interaction and coordination of work with other employees,' 'in-person interaction with outside colleagues, clients, or customers,' and 'immediate access to documents or other information located only in the workplace.'" *Ford*, 782 F.3d at 762 (quoting EEOC Fact Sheet, Work At Home / Telework as a Reasonable Accommodation (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html).

As to the third element, "[t]he term reasonable accommodation [comprises, among other things] . . . [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1). "Reasonable accommodation[s] may include . . . [j]ob restructuring; part-time or modified work schedules; appropriate adjustment or modifications of . . . policies; . . .

and other similar accommodations for individuals with disabilities." 29 C.F.R. § 1630.2(o)(2). "Employees must not only 'request to be accommodated, but [must] also provide their employers with a sufficient basis to understand that the request is being made because of their disability.'" *Tennial*, 840 F.3d at 307 (quoting *Deister v. Auto Club Ins. Association*, 647 F. App'x 652, 658 (6th Cir. 2016)). "A *prima facie* case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists." *Id.* at 306 (citing *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015)).

"An employer is required 'to initiate an informal, interactive process' when necessary to determine how an employee's disability limits her ability to work and to identify appropriate reasonable accommodations." *Williams*, 847 F.3d at 395 (quoting 29 C.F.R. § 1630.2(o)(3)). However, "[t]he employer's duty to engage in the interactive process arises only after an employee proposes a reasonable accommodation or shows the need for one." *Mathis v. City of Red Bank*, 657 F. App'x 557, 563 (6th Cir. 2016).

The plaintiff has submitted sufficient evidence to support all of the elements of his *prima facie* case for denial of a reasonable accommodation. *First*, the defendants do not seriously dispute — and the plaintiff certainly adequately has established — that he has a disability. The plaintiff has shown that he has a physical impairment (medically diagnosed chronic dermatitis and eczema) that substantially limits the major life activity of sleeping. *Second*, the plaintiff has offered ample evidence that he was qualified for his position as a "gaming engineering specialist," with or without any accommodation for his disability, based on the undisputed fact that he received satisfactory-or-

-18-

better performance evaluations while performing that job for more than a decade, both with and without the accommodation of the "flexible schedule" that he requested.

The defendants argue that the plaintiff has not shown that he was qualified for the position, because regular attendance on a fixed schedule is an "essential function" of most jobs, including the plaintiff's position. However, on this record, a jury reasonably could conclude that this is one of those "rare cases" in which regular attendance is not an "essential function." *See Williams*, 847 F.3d at 392. The defendants rely on *Ford*'s "general rule" on-site attendance is "essential to . . . interactive [jobs]." *Ford*, 782 F.3d 753 at 761-62. Here, however, unlike in *Ford*, there is nothing in the record to suggest that the plaintiff's job is one of "those involving teamwork and a high level of interaction," where an employer reasonably would be expected to "require regular and predictable on-site attendance from all employees." *Ford*, 782 F.3d at 762.

None of the factors suggested by 29 C.F.R. § 1630.2(n)(3), to which the *Ford* court looked for guidance, favor a finding that regular attendance is an essential function in this case. *First*, the "employer's judgment" in this case was exercised by the plaintiff's direct supervisor (although the defendants contend without proper authorization) to allow the plaintiff to work according to the "flexible schedule" that he desired for years without incident, and during all of that time he performed satisfactorily.

*Second*, the written description of the plaintiff's position does not anywhere specify that it must be performed according to a fixed schedule. Nor does it describe any duties that mandate frequent or continuous face-to-face interaction between the plaintiff and other employees or any persons outside the agency. The only interaction with other team members that is mentioned at all in the job description is that the plaintiff will "work as a team member with the audit specialist" to

conduct certain reviews and evaluations; nothing in the written description suggests that the plaintiff would not adequately be able to interact with the audit specialist to the degree required while working a schedule untethered to specific days and hours. As to his supervisor, the description states only that the plaintiff will receive "general guidance" about his duties and priorities. The plaintiff's record of satisfactory performance certainly suggests that he was able adequately to interact with his supervisor to receive that guidance during his "flexible period." Finally, the defendants' own description of the position notes that the "[e]ngineer will be exposed to gaming environments; this usually involves bending, standing, loud noises, cigarette smoke and *unusual working hours*," which certainly suggests that the department contemplated that its gaming specialists must not only be *allowed* to work odd schedules, but could be *required* to. Defs.' Mot. for Summ. J., Ex. 4, Position Description at 1 (Pg ID 330) (emphasis added).

The *third*, *fourth*, and *fifth* factors are of limited aid here. The time spent performing the function is of little or no relevance since the plaintiff would, under any proposed version of his schedule, work the same number of hours per week and per pay period: 40 hours per week and 80 hours per pay period. Only the days and times of those hours would vary. And the defendants have not pointed to any tangible "consequences" of allowing the plaintiff to work a flexible schedule. Wilson vaguely alluded to "safety concerns" related to the plaintiff working alone in the Gaming Lab; but the defendants have not pointed to any information or testimony to suggest what those concerns were, or the basis of them. The defendants do not dispute the plaintiff's basic contention that all of the facilities where he needs to work are secured by key-card access devices and accessible to him at any hour of the day, seven days a week, without any need for modification by the agency. Wilson also asserted that the plaintiff would have to "regularly" interact with his two

-20-

coworkers and his supervisor, but the defendants have offered nothing to explain how working on a flexible schedule would prevent the plaintiff from having "regular" contact with those other employees. The parties have not pointed to any provisions of a collective bargaining agreement that could be pertinent to the propriety of a flexible schedule.

Finally, the "work experience of past incumbents in the job" certainly favors a finding that attendance on a fixed schedule is not essential to the job, where it is undisputed that the plaintiff performed well in his position when he worked on a flexible schedule. And the defendants have not substantiated in this case any of the specific concerns which the EEOC has suggested could justify refusing a request to work from home, such as where "the job requires 'face-to-face interaction and coordination of work with other employees,' 'in-person interaction with outside colleagues, clients, or customers,' [or] 'immediate access to documents or other information located only in the workplace.'" *Ford*, 782 F.3d at 762 (quoting EEOC Fact Sheet, Work At Home / Telework as a Reasonable Accommodation (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html).

The defendants also contend that the reasonable accommodation claims cannot proceed because the plaintiff cannot show that he adequately and specifically identified the nature of his disability and the accommodation he wanted. That position is flatly contradicted by the record. The plaintiff has presented clear evidence from which a jury reasonably could conclude that he adequately presented his request.

In his initial "disability accommodation request," which was submitted on the defendants' own form, the plaintiff plainly asked to be allowed to work a flexible schedule that could vary from day to day, and to be allowed to work from home or on the weekends when performing tasks such as writing reports that did not need to be done at his regular work location. He attached a form

completed by his physician stating that he had a "chronic" and "physical" disability that caused "serious disruption" to his sleeping, which is a recognized major life activity under the ADA, as well as "pain and discomfort" throughout the day. In response to queries by Wilson, the plaintiff provided a health summary identifying the specific medical conditions that he was diagnosed with, which were described as eczema and dermatitis, and listing more than a dozen medications that were used to treat the condition. The plaintiff also responded to further questions to explain that the reason he could not conform to any fixed schedule, regardless of what "alternative" format it took, was that the "flare ups" of his condition were unpredictable, and the disruptions to his sleep schedule therefore were unforeseeable. As the plaintiff explained, and as Wilson explicitly mentioned in her denial of his request, the plaintiff's request was not for any specific fixed schedule, but to be allowed to modify his schedule on any day when his medical condition required it, and to make up missed hours later in the day, or on weekends, to ensure that he still would work a total of 80 hours in any pay period. The defendants have not pointed to any information to suggest why a "medical opinion" was needed for them to understand the nature and specifics of the plaintiff's request, or to identify his disability and understand why it could not be accommodated by any fixed work schedule.

Bridgewater has offered sufficient evidence on each element of his ADA discrimination claim to defeat summary judgment.

## C. Retaliation

Finally, the defendants contend that Bridgewater cannot prevail on his retaliation claim, because (1) he has not pointed to any consequence imposed by the defendants on him that is sufficiently severe to qualify as an "adverse action," and (2) he has not pointed to any evidence other

than proximity in time to show that the allegedly adverse actions were caused by his protected activity, and temporal proximity is not, in itself, enough to establish causation.

The ADA expressly protects from retaliation any individual who lodges a formal charge of disability-based discrimination. 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."). The Sixth Circuit also has noted that "this circuit and most others agree that requests for accommodation are protected acts." *A.C. ex rel. J.C. v. Shelby County*, 711 F.3d at 698.

To establish retaliation, a plaintiff "must show: (1) that he engaged in protected activity, about which the defendant was aware; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 814 (6th Cir.1999) (citing *Penny v. United Parcel Service*, 128 F.3d 408, 417 (6th Cir.1997)). There is no dispute that "requests for accommodation are protected acts." *A.C. ex rel. J.C. v. Shelby County*, 711 F.3d at 698. Moreover, it is undisputed that the plaintiff filed a charge of discrimination with the EEOC, which also is protected activity. 42 U.S.C. § 12203(a). Nor do the defendants deny that they were aware of the charge, and the plaintiff testified that he told his new manager in August 2015 that he had filed the charge. However, the defendants take issue with the last two elements.

Bridgewater contends that the adverse action by the defendants consisted of subjecting him to a months-long investigation, at the hands of the MGCB's lead criminal investigator, over a three-

hour timekeeping anomaly which, as it turned out, represented time that the plaintiff's supervisor, upon inquiry, stated that he had authorized. That suffices.

"To be adverse, a retaliatory action must be enough to dissuade a reasonable person from engaging in the protected activity; 'petty slights or minor annoyances' cannot qualify." *A.C. ex rel. J.C. v. Shelby County*, 711 F.3d at 698 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Sixth Circuit has observed that "the definition of adverse action is essentially the same" for ADA retaliation claims as that applied to retaliation claims under the First Amendment. *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (citing *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) ("In the First Amendment context, . . . we have held that any action that would deter a person of ordinary firmness from exercising protected conduct will [constitute a sufficient adverse action].")).

The defendants have not pointed to any information in the record to suggest why such a gratuitous inquisition was warranted into a matter that probably could have been resolved with a simple email or a phone call to the plaintiff's manager. The Sixth Circuit has held that gratuitous investigations — and even mere false reports that could prompt such investigations — can qualify as "adverse actions" in the context of retaliation claims. *A.C. ex rel. J.C. v. Shelby County*, 711 F.3d at 698 ("The type of intrusive investigation that Tennessee officials must conduct of such parents' homes and children to complete a DCS investigation could be powerfully dissuasive in its own right and only cements that conclusion. Not surprisingly, then, this Court and other courts *have treated the making of such reports as adverse*.").

The defendants argue at some length that none of the complained-of conduct was sufficiently "adverse" because the plaintiff never was demoted or discharged, and he was not disciplined as a

result of the "investigation" of the timesheet anomaly. But all of the cases that they cite involved claims of discrimination, not retaliation, and the more recent authority on which they rely explicitly recognizes that the "adverse action" standard is more expansive in retaliation cases. *Dendinger v. Ohio*, 207 F. App'x 521, 527 n.6 (6th Cir. 2006) ("The Supreme Court [held in *White*] that the definition of 'adverse employment action' is broader in retaliation cases than in discrimination cases. Because Dendinger does not state a retaliation claim, however, our statement in *White* remains applicable here."). The "materiality" standard to which the defendants allude is not relevant to the adverse action analysis under the controlling case law.

Similarly, the other actions complained of, such as imposing excessive scrutiny about the plaintiff's work hours and task completions, and removing him from a project committee that he was invited to serve on, also readily could be found by a jury to be consequences that would discourage a person of reasonable firmness from pursuing a discrimination charge, particularly given the close association between some of those consequences and the alleged discrimination in the first instance, which was focused on the plaintiff's request for a more flexible work schedule. It is difficult to categorize the defendants' investigation and heightened scrutiny of the plaintiff as "petty slights or minor annoyances."

The defendants also argue that there is no evidence of a causal connection between the protected conduct and the adverse action the plaintiff identified. "To prevail on a retaliation claim, a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Ford* , 782 F.3d at 770 (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). "'Closeness in time is one indicator of a causal connection,'" but "'where some time elapses between when the employer learns of a protected activity and the

subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.'" *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 513 (6th Cir. 2016) (quoting *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Bridgewater has furnished that evidence. He testified that the retaliation began within 17 days after he informed his new manager that he had filed a disability discrimination charge with the EEOC. And, contrary to the defendants' position, "temporal proximity" is not all that he offered. He also testified that the "tone" of the defendants' evaluation of his department distinctly changed from before he filed his charge to after, and shifted from an analysis of "what services the lab can provide" to "assume you will be outsourced." Moreover, a jury readily could conclude that there was a strikingly close association between the nature of the plaintiff's request for an alternative work schedule and the subsequent imposition of onerous scrutiny on his timekeeping, and the initiation of an investigation by the head of the agency's criminal division into a trivial timekeeping discrepancy involving work outside the plaintiff's regularly scheduled hours. That evidence is enough, along with a temporal proximity of less than three weeks, which the Sixth Circuit previously has recognized as "significant" for the causation analysis, to allow a jury reasonably to conclude that the alleged retaliation was prompted by, and would not have happened in the absence of, the plaintiff's discrimination complaint. As the Sixth Circuit explained when considering similar facts:

> In this case, the evidence produced at trial established that Plaintiff was terminated roughly three weeks after she sent her email to Rossi and Parsons. This is comparable to the roughly three-week gap that we found significant in *Spengler*. Importantly, this temporal proximity was coupled with Plaintiff's testimony that she did not commit the errors for which she was purportedly terminated, or that some of those same errors were sometimes committed by non-terminated male coworkers. Together, these facts were sufficient to establish the fourth element of Plaintiff's *prima facie* case.

*Braun*, 828 F.3d at 513 (citations omitted).

Bridgewater has offered sufficient evidence on all the elements of his retaliation claim.

<center>III.</center>

The evidence submitted establishes that the MGCB has waived its immunity under the Eleventh Amendment on the plaintiff's Rehabilitation Act claim against it. The plaintiff has offered enough evidence to establish fact disputes requiring a trial on his disability discrimination and retaliation claims against both defendants.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #33] is **DENIED**.

It is further **ORDERED** that the final pretrial conference is adjourned to **October 24, 2017 at 9:00 a.m.**

It is further **ORDERED** that trial is adjourned to **November 7, 2017 at 8:30 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  October 10, 2017

<div style="border:1px solid black; background:#ccc;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 10, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI

</div>